GARDNER GOVERNOR CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 321.   Decided October 13, 1926.

1. A deduction for exhaustion, wear and tear and obsolescence of buildings at 5 per cent per annum, and of machinery at 10 per cent per annum, during the taxable years, *held* reasonable in the circumstances of this proceeding.

2. The earnings available for the payment of a dividend on a given date during the taxable year should not be reduced by the amount of a tentative tax computed upon such earnings to such distribution date. *Appeal of L. S. Ayers & Co.*, 1 B. T. A. 1135.

3. In the absence of evidence showing the amount of current earnings available on March 15, 1920, for the payment of a dividend declared and paid on that date, the determination of the Commissioner of the amount of such earnings by allocating to the period from January 1 to March 15, 1920, the proportion of the earnings for the entire year as the number of days to the distribution date was to the entire year, is approved.

*Robert Ash, Esq.*, for the petitioner.
*A. H. Fast, Esq.*, for the respondent.

On May 6, 1924, the Commissioner determined deficiencies in income and profits tax for the calendar years 1919, 1920 and 1921, in the amounts of $6,111.95, $21,329.94, and $3,792.83, respectively. Certain issues have been eliminated by stipulation, and the questions submitted to the Board are as follows: (1) Should the petitioner be allowed a deduction for exhaustion, wear and tear and obsolescence of buildings at the rate of 5 per cent per annum, instead of 2 per cent?  (2) Should the deduction for exhaustion, wear and tear and obsolescence of machinery and tools have been computed at the rate of 10 per cent per annum, instead of 8 per cent?  (3) Should the current earnings available for the payment of dividends declared during the taxable year be reduced by the amount of a tentative tax?  (4) Whether, in computing invested capital for 1920, a loss of $53,205.71 on the sale of Liberty bonds on September 8, 1920, should have been taken into consideration by

the Commissioner in determining the amount of earnings from January 1 to March 15, 1920, available for the payment of a dividend on the last-mentioned date.

### FINDINGS OF FACT.

The petitioner is an Illinois corporation, engaged in the manufacture of pumps, air compressors and governors, with principal office at Quincy.

Fifteen or twenty years prior to the taxable years the petitioner constructed certain factory and office buildings with stone walls and wood roofs, having poor light and ventilation. At that time its principal product consisted of steam engine governors, and no consideration was given to the use of heavy foundry machinery which it was subsequently found necessary to install, or traveling cranes for transportation of heavy material from place to place within these factory buildings. Little consideration was given to the lighting effect, and the only source of light was small windows placed at a considerable distance apart. The lasting quality of the walls and the exterior beauty of the buildings was the principal thought in the minds of the officers of the corporation. These buildings conformed substantially to the general type of foundry buildings at the time of their construction, and were then considered adequate for the petitioner's use. A few years later, however, industrial conditions changed materially, and by reason of this fact, together with the changes and development of petitioner's business, petitioner found itself greatly in need of new and more modern buildings, both for manufacturing and office purposes. The nature of petitioner's business had changed from a production of 80 per cent of light castings to 80 per cent of heavy castings. As stated by the petitioner's principal officer, " The business originally was the manufacture of steam engine governors, but the introduction of gasoline and oil engines, and later the distribution of electric power, both from the steam generated power stations and the hydraulic electric power stations, has so revolutionized our business that today the governor business amounts to about 5 per cent, and the manufacture of pumping machinery and air compressors is about 95 per cent." As a result of these changes, the petitioner prior to and during the taxable years constructed entirely new and modern buildings of steel framework and glass sidings, and installed therein the necessary equipment, including overhead and bridge cranes for transporting heavy material and machinery manufactured, so as to be in a position to compete with other manufacturers in this field, and also to obtain greater production, as well as to provide workmen with facilities conducive to the best workmanship.

As quickly as the new buildings could be constructed on ground adjacent to the old ones, the old ones were abandoned for manufacturing purposes and thereafter utilized to a small extent only for storage purposes. Petitioner claimed a deduction for exhaustion, wear and tear and obsolescence during the taxable years at a composite rate of 5 per cent on all of its buildings. The Commissioner computed the deduction at 2 per cent.

Prior to and during the taxable years, petitioner installed machinery necessary in the manufacture of pumps and compressors. In connection with its product it is necessary to manufacture what is known as hydraulic castings, which must withstand high pressure tests, in which the maximum tolerance allowable is one two-thousandths of an inch, and their character requires the highest degree of workmanship. Due to the rapid progress in the engineering and manufacturing art and the changing needs of trades and businesses in which petitioner's principal product was used, and the necessity of manufacturing new designs, it was necessary to acquire new and different machinery. The obsolescence of a large proportion of petitioner's machinery and tools was rapid. Petitioner formerly used machine tools made of carbon steel. These tools were replaced " by the introduction of tungsten and other methods that developed a steel that could, in cutting, get so hot it would not draw the temper. The speed of machine tools with carbon steel is always limited to how much heat is generated at the cutting point, beyond which point you could not go, because if you did the carbon steel would just melt away and the edge was gone. With the introduction of high speed steel, this meant you could get double the cutting speed, and as development went on you could increase it 300 to 500 per cent. The result was that you could not get the benefit from high speed cutting tools with the old machinery, because if you tried to, the machine would either stand still through inadequate power or break down at some point. The introduction was somewhat slow owing to the hesitancy of owners of machine shops to recognize this new and very radical departure. Some were more farsighted than others and took advantage of it very quickly."

Through the use of high speed steel, petitioner's production was greatly increased and operating costs were reduced.

The petitioner operated two foundries, one at Quincy and one at LaGrange, Ill. During 1919 and 1920 the machine shop at the Quincy plant was operated 55 hours and the foundry at the LaGrange plant was operated 59 hours a week, instead of the usual period of 48 hours. During the taxable years petitioner was compelled to employ a great many unskilled laborers and its machines were operated by inexperienced mechanics, which caused the machinery and equipment to depreciate more rapidly than otherwise.

Petitioner claimed a composite rate of 10 per cent for the exhaustion, wear and tear and obsolescence of all of its machinery, tools, and foundry equipment. The Commissioner computed the deduction at the rate of 8 per cent.

On March 15, 1920, the petitioner declared and paid a dividend of $108,975.

For the purpose of determining the amount of available earnings on March 15, 1920, for the payment of a dividend declared on that date, in connection with the computation of invested capital, the Commissioner allocated 74/366 of the income for the entire year to the period from the beginning of the year to that date. On September 8, 1920, petitioner sold certain Liberty bonds at a loss of $53,205.71.

In determining the amount of current earnings available for the payment of dividends, the Commissioner computed a tentative tax upon the income allocated to the date of the dividend and reduced the available current earnings accordingly.

The parties have stipulated as follows—

(1) Petitioner is entitled to the following deductions representing contributions and bonuses:

| | |
|---|---|
| 1919 | $4,527.28 |
| 1920 | 2,965.77 |
| 1921 | 917.28 |

(2) Petitioner is entitled to a deduction of $901.22 for 1919, as a loss on the sale of office furniture, and a deduction of $553.85 for 1920, as a loss on the sale of machinery and equipment.

(3) On January 1, 1919, a dividend of $22,500 was paid, and on January 2, 1919, a dividend of $45,000 was paid.

### OPINION.

LITTLETON: The proper allowance for the exhaustion, wear and tear and obsolescence of property is a question of fact in each case. The evidence submitted on this point consists of the testimony of numerous witnesses well qualified to state all the facts and to express an opinion on the subject of the useful life of petitioner's property. The record evidence is in detail and goes into every phase of the question of exhaustion, wear and tear, and obsolescence of petitioner's buildings, machinery, tools, and foundry equipment and is in no wise contradicted. In our opinion, the evidence fully justifies the claim that a deduction for exhaustion, wear and tear, and obsolescence of buildings during the taxable year at a composite rate of 5 per cent per annum, and for the exhaustion, wear and tear and obsolescence of machinery, tools, and foundry equipment at the rate of 10 per cent per annum, is conservative and should be allowed.

The next question relates to the correctness of the Commissioner's action in reducing the amount of current earnings found to have been available for the payment of a dividend by the amount of tentative tax computed thereon to such dividend date. The Board has held that current earnings available for the payment of a dividend should not be reduced by the amount of a tentative tax computed thereon. *Appeal of L. S. Ayers & Co.*, 1 B. T. A. 1135. We find no reason for changing the decision reached in that appeal.

The next point in controversy concerns the correctness of the Commissioner's determination of the amount of current earnings available for the payment of dividends on March 15, 1920.

The petitioner's plants were operated overtime and its operations were profitable throughout the year 1920. The return for 1920 showed a gross income of $1,134,440.95, and a net income of $666,542.02, upon which it paid a tax of $196,495.53. On March 15, 1920, it declared and paid a dividend of $108,975. On September 8, 1920, the corporation sold certain Liberty bonds purchased in a prior year, at a loss of $53,202.71. When auditing the return for 1920 the Commissioner, after determining the net income for the year by the allowance of the loss of $53,202.71 on the sale of Liberty bonds on September 8, 1920, and through certain other adjustments took 74/366 thereof, and after computing a tentative tax thereon from January 1 to March 15, 1920, subtracted the amount so determined as earnings for the period available for the payment of the dividend, from the amount thereof, and reduced earned surplus by the difference. The petitioner claims that the Commissioner fell into error when he failed to take into consideration in his computation the fact that the loss of $53,202.71 occurred six months after the payment of the dividend and should not have operated to reduce the current earnings available on March 15, 1920.

The petitioner does not claim that the Commissioner's formula for determining the amount of earnings available on any given date was erroneous, but it insists that, under the facts of this case, the amount of the available earnings on March 15, 1920, determined by the method of allocating to the period from January 1 to March 15, the proportion of the earnings for the entire year as the number of days to the date of the dividend (which in this case was 74/366) was to the whole year, should have been increased by the amount of $53,202.71.

Subsection (e) of section 201 of the Revenue Act of 1918 provides as follows:

Any distribution made during the first sixty days of any taxable year shall be deemed to have been made from earnings or profits accumulated during preceding taxable years; but any distribution made during the remainder of the taxable year shall be deemed to have been made from earnings or profits

GARDNER GOVERNOR CO. **75**

accumulated between the close of the preceding taxable year and the date of distribution, to the extent of such earnings or profits, and if the books of the corporation do not show the amount of such earnings or profits, the earnings or profits for the accounting period within which the distribution was made shall be deemed to have been accumulated ratably during such period.

We construe the above provision of the statute to contemplate that the extent to which earnings are available for distribution, after the first sixty days, shall be determined in one of two ways. If the books of account clearly show the earnings between the close of the preceding taxable year and the date of distribution, such earnings are deemed to have been available for the distribution. On the other hand, if the books of account do not show the earnings to the distribution date, the earnings for the taxable year in which the distribution is made are deemed to have been accumulated ratably during the year, and the earnings available at any distribution date are deemed to have been that proportion of the earnings of the taxable year which the period of time between the close of the preceding taxable year and the distribution date bears to the whole period of time constituting the taxable year. If the second or alternative method must be used to ascertain the earnings available for distribution at any given date, the statute contemplates that the earnings shall be deemed to have been accumulated ratably over the taxable year, without regard to particular events which may be singled out and shown to have affected the earnings before or after the distribution date. In other words, if the method is to be used, it must be used in its entirety and not partially. Congress must have realized the endless and hopeless confusion and disputes which would arise if, in those cases in which the books do not show the earnings to the distribution date, the earnings available for distribution were to be determined upon any other theory than that the earnings of the year in which the distribution was made were accumulated ratably over the year. The theory advanced by petitioner is neither the one nor the other of the two tests prescribed by the statute, but, rather, a mixture of both; and the fact that it can be applied only just so far as the petitioner chooses to do so is sufficient ground for its rejection.

It is therefore the duty of the petitioner to show the earnings to the date of distribution. If it fails in this regard, the earnings available at any distribution date must be determined by spreading the earnings of the taxable year ratably over the year, without regard to the particular time at which they may have been earned during the taxable year or to their source of derivation.

Certain other issues were raised in the pleadings but were disposed of by stipulation or abandoned by the petitioner at the hearing.

*Judgment will be entered on 15 days' notice, under Rule 50.*